

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS



# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 29, 2018**

**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Nardos Imam, | § | Case No. 16-33362-hdh7 |
| | § | |
| Debtor. | § | |
| | § | |

---

| | | |
|---|---|---|
| Mackenzie Leigh, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 16-03156-hdh |
| | § | |
| Nardos Imam, | § | |
| | § | |
| Defendant. | § | |
| | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 2, 2016, Mackenzie Leigh, LLC (the "Plaintiff") filed a complaint initiating the above-captioned adversary proceeding against Nardos Imam (the "Defendant"). Through the complaint, the Plaintiff is asserting a claim against the Defendant for common law fraud in connection with the Plaintiff's investment in a failed joint business venture with the Defendant. The Plaintiff claims that the Defendant fraudulently induced the Plaintiff to contribute funds to

Nardos Imam LLC (the "Company") based on representations by the Defendant that she would assign certain intellectual property to the Company, which she did not do. The Plaintiff is also seeking exemplary damages, attorneys' fees, costs, and allowable interest. The Plaintiff is seeking to except its claims from discharge, contending that the Defendant's conduct constitutes false pretenses, false representations, and actual fraud within the meaning of 11 U.S.C. § 523(a)(2).

The Court conducted a trial in this case over the course of three days in October 2017. After trial, the Court took the matter under advisement. The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings, by Federal Rule of Bankruptcy Procedure 7052.[1]

## I. Jurisdiction and Venue

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding involves a core matter under 28 U.S.C. § 157(b)(2)(A) and (I), as the adversary proceeding involves a determination as to the dischargeability of a particular debt. Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a).

## II. Findings of Fact

### A. The Parties

The Plaintiff is a Texas limited liability company owned by Mackenzie Brittingham. Ms. Brittingham formed the Plaintiff on October 18, 2012 through her attorneys at Haynes and Boone, LLP for the purpose of holding her interest in the Company. Ms. Brittingham received a degree in accounting from Southern Methodist University in 2009.

The Defendant was born and educated in what is now Eritrea, a small country in Northeast Africa. After immigrating to the United States and working various jobs in Dallas, Texas, the

---

[1] Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa*.

Defendant enrolled in classes at El Centro College in pursuit of her dream of becoming a fashion designer and working in the fashion industry.  She attended El Centro for two years and completed her studies in 2006.  She was then hired by Richard Brooks Couture Fabrics, where she sold fabrics and made and designed dresses for approximately one and a half years.

In 2007, the Defendant was hired as a seamstress and tailor by Stanley Korshak, a luxury goods specialty store in Dallas.  During her last several years at Stanley Korshak, she served as an in-house designer.  She also became recognized as one of Dallas's premier fashion designers, with an established base of clients and customers.

Ms. Brittingham first met the Defendant in 2011 when Ms. Brittingham was preparing for her wedding.  Ms. Brittingham engaged the Defendant to create a wedding gown, and the Defendant did in fact create the wedding gown and nine or ten fox fur wraps for Ms. Brittingham's party.  During the course of designing and making these, Ms. Brittingham and the Defendant became friends.

**B.      The Business Proposal**

In the summer of 2012 (a few months after Ms. Brittingham's wedding), Ms. Brittingham and the Defendant began discussions about forming a business to operate a luxury women's clothing salon and bridal boutique in Dallas, Texas.  The salon and bridal boutique was to specialize in custom wedding gowns and other clothing designed and created by the Defendant.

It is Ms. Brittingham's testimony that the Defendant initiated these discussions, representing that she was planning to leave her employment with Stanley Korshak to pursue her dream of becoming a world-renowned designer.  In the *Joint Pretrial Order* [Docket No. 150], the Defendant claimed that Ms. Brittingham approached her about the idea.

In any event, both parties were interested in moving forward with the business, and they began working out the business points of their deal, forming the entity, and getting the operations of the Company started.

**C.      Negotiating and Finalizing the Business Terms for the Company**

Though discussed throughout these Findings and Conclusions, the Court would like to note at the outset that understanding the business relationship between Ms. Brittingham and the Defendant, the eventual terms of their deal, and what each communicated and intended along the way, is somewhat complicated by a few factors.

First, there were some language issues. English does not appear to be the Defendant's first language. The Court observed during trial that while the Defendant is conversational in English, her word choice was not always precise or consistent. This language difficulty was compounded by the fact that even though Ms. Brittingham and the Defendant are both well-educated, neither had a complete grasp of legal terms that were being used during negotiations.

Second, the parties started running their business while business terms were still being negotiated. When Ms. Brittingham and the Defendant decided to go into business together, they did not prepare or sign any written term sheet or other document at the outset outlining the principal terms of their proposed agreement or business venture. Nevertheless, the parties proceeded with laying the groundwork for their business, making financial contributions, and signing a store lease essentially at the same time that the *Limited Liability Company Agreement of Nardos Imam Limited Liability Company* (the "LLC Agreement"), which contained business terms that were being negotiated, was being drafted. This resulted in the Company actually beginning operations before the LLC Agreement was finalized and executed.

4

Third, even though both the Plaintiff and the Defendant were represented by attorneys during this process, they were trying to save money, which resulted in the attorneys not being as involved as one might hope. Most notably, the parties chose to sign the LLC Agreement without their attorneys present and did not send signed copies of the LLC Agreement to their attorneys immediately afterward.

Finally, it took over a year from the time the initial draft of the LLC Agreement was produced until a final version was signed, and the communications between the parties over the course of this extended period of time are difficult to follow. This was true for a few reasons. For one, the attorneys involved testified that they never spoke with each other. Drafts and comments were generally sent from an attorney to their client, forwarded to the other party, and then forwarded to the other party's attorney, so there were a large number of fragmented communications.

The manner in which the parties communicated also left something to be desired. Sometimes the parties communicated with each other and their attorneys by e-mail, sometimes by phone, and sometimes in person. Occasionally, there is a large unexplained gap between when one party received an e-mail and when that party responded or forwarded the e-mail. In some instances, a conversation was apparently started with an e-mail and then completed with an in-person conversation. The Court was presented with notes taken by Ms. Brittingham regarding conversations, but those notes present their own set of issues. In Exhibit 1, for instance, Ms. Brittingham typed up notes from her conversation with her attorney to send to the Defendant. Exhibit 1, however, is an e-mail transmitting those notes to Ms. Brittingham's then-husband, not the Defendant. There is no e-mail showing that this communication to the Defendant was actually sent to the Defendant. Instead, Ms. Brittingham testified that the e-mail was subsequently printed

out and a physical copy was handed to the Defendant, but the Defendant testified that she did not remember receiving a physical copy of the notes.

It is against this backdrop that the Court attempts to discern the representations and intent of the parties in entering into the LLC Agreement.

### 1.  Drafting and Negotiating the LLC Agreement

After conferring with Ms. Brittingham as to the principal business points of the agreement, Troy Christensen, an attorney with Haynes and Boone, began drafting the LLC Agreement.  A first draft of the LLC Agreement was circulated internally at Haynes and Boone on November 26, 2012.[2]  A draft of the LLC Agreement was first sent to Ms. Brittingham on December 13, 2012 (the "Second Draft").   Section 4.1(b) of the Second Draft stated that the Defendant "shall contribute the property described on Exhibit A to the Company" and Exhibit A included:

1. Design concepts, plans, and sketches for designer clothing and accessory lines, marketing studies, feasibility studies, financial pro-formas, models and samples of any clothing and accessories, and any other information or development ideas that could be helpful to the purpose of this Company.

2. [Fabric, equipment, other personal property]

3. [Intellectual property]

A third draft of the LLC Agreement, which left section 4.1(b) and Exhibit A unchanged, was sent to Ms. Brittingham on March 1, 2013.  A fourth draft of the LLC Agreement (the "Fourth Draft"), which also left section 4.1(b) and Exhibit A unchanged, was sent to Ms. Brittingham on March 11, 2013.  Ms. Brittingham testified that she did not send the Fourth Draft to the Defendant but that she did give it to her in March of 2013, presumably in the form of a hard copy in person.  The Defendant does not remember receiving this draft or discussing it with Ms. Brittingham.

---

[2] Both parties in this case waived the attorney-client privilege to allow the attorneys who represented them during this process to testify at trial.

On September 12, 2013, Mr. Christensen sent Ms. Brittingham another draft of the LLC Agreement (the "Fifth Draft").[3] The Fifth Draft left section 4.1(b) unchanged but inserted a note in Exhibit A asking if the Defendant owns any copyrights, trademarks, or patent filings or registrations. The Fifth Draft was sent to the Defendant, but she testified that she did not read it closely and instead forwarded it to her own attorney, John Bonnet, for review. The Defendant explained that she did not read most of the legal documents that she received very closely because she is not a fast reader.

On September 19, 2013, Mr. Bonnet sent the Defendant a redline version of the Fifth Draft with his recommended changes and comments (the "Bonnet Redline"). The Bonnet Redline did not change section 4.1(b) but on Exhibit A, it did strike out "Intellectual property" and include the note "Discuss." The Defendant testified that she reviewed the Bonnet Redline more closely than the other drafts and she discussed the Bonnet Redline, and the assignment of intellectual property specifically, with Mr. Bonnet. During this discussion with her attorney, the Defendant claims that she told Mr. Bonnet that she was not intending to assign her intellectual property to the Company. Mr. Bonnet similarly testified that he discussed the assignment of intellectual property with the Defendant, but that he left it to her to discuss the business terms with Ms. Brittingham. The Defendant testified that after her discussion with Mr. Bonnet about intellectual property, she discussed it with Ms. Brittingham as well and asked that they "take out" the intellectual property. Later in testimony, the Defendant worded it slightly differently, saying that she requested the intellectual property "come out."

In an interesting divergence between the testimony of Ms. Brittingham and the Defendant, Ms. Brittingham testified that the Defendant never, at any point, said anything about not wanting

---

[3] There was a significant gap in time between the Fourth Draft and the Fifth Draft because the Defendant was pregnant and did not wish to start the Company until after she had her baby.

to assign her intellectual property.  Ms. Brittingham does, however, remember the Defendant—during their conversation on September 19, 2013—asking for the intellectual property to be removed from Exhibit A and put into a separate assignment document (the "IP Assignment").  This recollection is odd because the notion that the Defendant suggested the intellectual property be assigned in a separate document from the LLC Agreement is undermined by a significant amount of evidence.  The Defendant obviously denies asking for the intellectual property to be conveyed by separate assignment.  Mr. Bonnet does not recall ever advising the Defendant to split up the LLC Agreement and the IP Assignment, and such a suggestion is not in the Bonnet Redline.  There is, however, an e-mail on September 20, 2013 between Haynes and Boone attorneys in which one of their intellectual property attorneys mentions the possibility of splitting the IP Assignment from the LLC Agreement wherein the Defendant would contribute "her personal name as a trademark (in connection with dresses, dress designing, and related business)."  Mr. Christensen testified that the intellectual property attorneys at Haynes and Boone suggested conveying the Defendant's intellectual property through a separate assignment document and that he communicated this recommendation to Ms. Brittingham.

So it is clear that Ms. Brittingham's attorneys independently suggested separating the LLC Agreement and the IP Assignment, and Ms. Brittingham recalls Mr. Christensen making such a suggestion.  Nevertheless, Ms. Brittingham testified on cross-examination that she does not know exactly where the concept came from to separate the LLC Agreement and the IP Assignment but that she does know that the Defendant told her that Mr. Bonnet wanted the intellectual property assignment to be in a separate document.

On September 24, 2013, Ms. Brittingham sent an e-mail to the Defendant:[4]

---

[4] The Court has taken the liberty of correcting obvious typos in this communication between the parties as well as the others that appear in these Findings of Fact without additional notation.

> I just talked to Troy. He is finalizing the LLC and said that we could do 2 different documents. The Partnership agreement with your list of assets totaling $80,000 and then another one like you requested contributing your skills as a designer. He has not gotten your comments yet from your lawyer. If you want those in there please send them over and I can forward to Troy. . . .

The Defendant apparently responded to this e-mail by forwarding the Bonnet Redline to Ms. Brittingham, but in that e-mail, the Defendant said nothing about the IP Assignment. The Defendant testified that she had no objection because she requested that the intellectual property assignment come out of the agreement, and it sounded to her like that had happened.

On September 30, 2013, Mr. Christensen sent an e-mail to Ms. Brittingham asking if she ever received the comments from the Defendant's attorney, and on October 4, 2013, Ms. Brittingham sent her attorney the Bonnet Redline she received from the Defendant ten days earlier.

On October 8, 2013, Mr. Christensen e-mailed Ms. Brittingham a final draft of the LLC Agreement (the "Final Draft"). In the Final Draft, Ms. Brittingham was required to contribute $200,000 to the Company, and the Defendant was required to contribute $80,000 worth of property, including equipment and production materials, to the Company. Each party would receive a 50% membership interest in the Company. The Final Draft also included a worldwide one year "Non-Competition" provision for the Defendant. Ms. Brittingham testified that if the Defendant ever left the Company, this would allow her to get back into the business after waiting for a year. It is also notable that the Final Draft did not include provisions to address irreconcilable differences between the two equal members of the Company.

The Final Draft incorporated some, but not all, of the comments from the Bonnet Redline. With regard to the changes in the Bonnet Redline on intellectual property, Mr. Christensen testified that he never found out what Mr. Bonnet meant when he wrote "Discuss" on Exhibit A, and Mr. Christensen did not remove the assignment of intellectual property because Ms. Brittingham never instructed him to do so. In the Final Draft, section 4.1(b) was reworded to reflect the bifurcation

of property included on Exhibit A, which would be conveyed through a Bill of Sale, and the IP Assignment attached as Exhibit B. Indeed, the IP Assignment was very broad, including copyrights, trademarks, trade names, service marks, goodwill, and all name and likeness rights.

On the same day she received it, Ms. Brittingham forwarded the Final Draft to the Defendant, and the Defendant forwarded the Final Draft to Mr. Bonnet. The Defendant testified that she did not read the Final Draft, instead relying on Mr. Bonnet to read it. Ms. Brittingham did testify that she discussed the Final Draft with the Defendant though.

About a week later, Mr. Bonnet asked the Defendant what she and Ms. Brittingham agreed to so that he could make sure the agreements were accurately reflected in the Final Draft. The Defendant replied, laying out several key terms but saying nothing about the assignment of intellectual property. Mr. Bonnet responded to the Defendant a few days later, pointing out a few key items in the Final Draft, including: "You are contributing, by bill of sale and IP assignment, certain materials and equipment, designs, name, copyrights, etc." Mr. Bonnet testified that he spoke to the Defendant and she said that she did not intend to assign all of her intellectual property, which she considered too broad. The Defendant also testified that she asked Ms. Brittingham why intellectual property was still being assigned. Ms. Brittingham maintains that such a conversation never took place because the Defendant never objected to the IP Assignment at any point. Ms. Brittingham further testified that had the Defendant ever raised an issue with the IP Assignment, Ms. Brittingham would not have gone forward with the deal, or at the very least, would have discussed it with her attorney before agreeing to anything.

### 2. Signing the LLC Agreement

Although both parties had engaged attorneys to assist them in forming and documenting the Company, they signed the LLC Agreement without their attorneys being present to provide

assistance and guidance at the signing. The problem that this presents is that the LLC Agreement was signed but the IP Assignment was not, and the parties' accounts of what happened differ materially.

On October 29, 2013, Ms. Brittingham sent an e-mail to Mr. Christensen asking some questions about how to sign the documents. She asked if they needed a notary and asked if they just needed to sign the LLC Agreement, the IP Assignment, and the Bill of Sale. Mr. Christensen responded that she did not need a notary and that she just needed to remove the "draft" header from the documents and then sign them. On that same day, Ms. Brittingham and the Defendant discussed the LLC Agreement, and the Defendant had some questions, but not about the IP Assignment.

On October 31, 2013, the Defendant sent an e-mail to Mr. Bonnet asking him to look at the Final Draft, and he responded to her with a list of issues for her attention, including that she was still "contributing, by bill of sale and IP assignment, materials and equipment, designs, name, copyrights, etc."

Later on October 31, 2013, Ms. Brittingham wrote an e-mail to her then-husband to ask him to fix some small things, such as adjusting the date and the Company's address. Once they got the revised version back, Ms. Brittingham, the Defendant, and the Defendant's husband signed the LLC Agreement.

The parties agree that the LLC Agreement was signed on October 31, 2013 and that Ms. Brittingham, the Defendant, and the Defendant's husband all met at the salon on Sherry Lane, without attorneys, for the purpose of signing the LLC Agreement. The parties signed two copies of the LLC Agreement, and Ms. Brittingham took her copy and put it in her safe. Neither party sent a signed copy of the LLC Agreement to their attorneys following its execution. The parties

both acknowledge that the IP Assignment and the Bill of Sale were not signed, but their explanations for why they were not signed is the point of disagreement.

The Defendant claims the IP Assignment was intentionally removed based on the parties' agreement that it would not be part of the deal. The Defendant claims she saw that the IP Assignment was still included with the LLC Agreement but believed it could be taken out by simply removing it from the stack of papers. For this reason, it was not necessary to ask for the removal of the IP Assignment when they asked Ms. Brittingham's then-husband to do the other last-minute edits. Nothing was stapled, so when it came time to sign, they just removed the IP Assignment from the LLC Agreement and did not sign it. The Bill of Sale was removed at the same time by mistake. The Defendant testified that she did not realize the language in section 4.1(b) of the LLC Agreement would still require that the IP Assignment be signed.

Ms. Brittingham does not know how it happened that the IP Assignment was not signed, but she maintains that it was a mistake and did not happen as a result of a conscious decision. From her testimony, it seems that Ms. Brittingham thinks the IP Assignment and the Bill of Sale were attached to the LLC Agreement at the time of signing, but just were not themselves signed. But she also thinks it is possible that she only printed the LLC Agreement and did not print the Bill of Sale or the IP Assignment. In any event, Ms. Brittingham testified that it was always her intention to sign the LLC Agreement, the IP Assignment, and the Bill of Sale.

**D.      Operation of the Business**

It is important to note that at the same time the LLC Agreement was being drafted and negotiated, Ms. Brittingham and the Defendant moved forward with the business. The parties went so far as to actually begin operations for the Company before having a written document memorializing their business relationship.

### 1.  Business Activities Prior to Execution of the LLC Agreement

Prior to signing the LLC Agreement, the parties had active and frequent discussions about things like what exactly the Company would sell and where it would be located, but Ms. Brittingham and the Defendant also took a trip to Los Angeles to purchase about ten thousand dollars' worth of fabric for the Company in September or October of 2012.

Business preparations continued throughout 2013, and one of the most significant tasks was selecting a location for the Company's store and negotiating a lease.  In August of 2013, the Defendant signed a lease, in her own name, for a storefront for the Company at 6170 Sherry Lane. Around this same time, the Defendant resigned from her position at Stanley Korshak.

The Company was actually formed on September 19, 2013 when a certificate of formation was filed with the Texas Secretary of State.  The Company began operations that same month, occupying temporary space on Lovers Lane while the Sherry Lane premises were being finished out.  Still without a signed LLC Agreement, the Company incurred expenses for its lease, payroll, supplies, and so on, in October of 2013.  In all, the Plaintiff contributed $79,000 by directly paying expenses of approximately $79,000 (the "Pre-Agreement Funds") prior the LLC Agreement being signed.[5]  The parties actually signed the LLC Agreement on October 31, 2013, over a month after the formation of the Company.

### 2.  Operation of the Company After Execution of the LLC Agreement

Following execution of the LLC Agreement, the Plaintiff contributed an additional $121,000 by depositing those funds (the "Post-Agreement Funds") into the Company's bank account on or after November 1, 2013.

The Company initially had financial success, with gross sales of over $1 million in its first

---

[5] At trial, the Defendant disputed the exact amount of the Pre-Agreement Funds that the Plaintiff advanced to pay expenses and that those expenses benefitted the Company.

year of business. During this time, managerial issues between Ms. Brittingham and the Defendant were present and went unresolved, but the Company continued to operate.

Ms. Brittingham testified that in April of 2014, she and the Defendant had a disagreement during which the Defendant threatened to get lawyers involved, and it was this disagreement that caused Ms. Brittingham to review the LLC Agreement and discover that the IP Assignment was not signed. On April 8, 2014, Ms. Brittingham sent an e-mail to the Defendant stating:

> Here is our intellectual property agreement we agreed to sign. We never did. Remember you had the lawyer separate it from the partnership agreement. We need to sign this also to finalize the paperwork.

The record did not reflect any response to this e-mail, and the Defendant testified that she received the e-mail but walked over to Ms. Brittingham to discuss it. The IP Assignment was not signed, and the matter was left unresolved. The Company, however, appears to have continued on successfully for some time thereafter with both Ms. Brittingham and the Defendant actively participating in its operations.

On April 15, 2015, the Company made distributions to both Ms. Brittingham and the Defendant in the amount of $65,000 each. This is significant for two reasons. First, it shows that the Company was doing well enough to distribute funds. Second, a distribution was authorized for the Defendant despite the fact that the Plaintiff had not yet recovered its $200,000 contribution. Section 6.1(a) of the LLC Agreement entitled the Plaintiff to the entire amount of any distributions until its contribution was repaid in full, but the parties expressly waived section 6.1 in the Distribution Agreement so that the Defendant could also receive a distribution at that time. This, of course, took place after the Plaintiff was aware that the IP Assignment had not been signed and over a year after Ms. Brittingham sent an e-mail to the Defendant asking her to sign the IP Assignment.

**E.** **Termination of the Company**

On June 15, 2015, the Defendant filed a petition in the 162nd Judicial District Court of Dallas County, Texas, at Cause No. DC-15-06818, requesting the wind up and termination of the Company because of managerial deadlock. On July 1, 2015, the Plaintiff opposed the petition and filed counterclaims against the Defendant, accusing the Defendant of fraud, theft, negligent misrepresentation, breach of fiduciary duty, and similar misconduct. On that same day, Ms. Brittingham sent a follow up to her e-mail dated April 8, 2014 again asking that the Defendant sign the IP Assignment.

The state court entered summary judgment in favor of the Defendant, granting her request to terminate and wind up the Company. A liquidator was appointed to wind up the Company and dispose of its assets. All non-insider creditors of the Company were paid by the liquidator, and the Plaintiff received $1,000. The state court entered an order terminating the Company, and appropriate filings were made with the Texas Secretary of State.

The Defendant resigned from the Company on August 5, 2015 and ultimately filed a voluntary petition under Chapter 7 of the Bankruptcy Code on June 20, 2016. She received a discharge under section 727 on August 14, 2017. *See Order of Discharge* [Case No. 16-33362, Docket No. 51]. The Plaintiff subsequently filed the present action asserting a claim against the Defendant for common law fraud, claiming that the Defendant fraudulently induced the Plaintiff to contribute funds to the Company based on representations by the Defendant that she would assign certain intellectual property to the Company, which she did not do.

**F.** **The Intellectual Property at Issue**

During trial, the parties often spoke generally about intellectual property, but it was not always clear what was meant when the term was used by the parties, the attorneys, and in the

15

documents. For this reason, the Court believes it is helpful to closely examine the evidence regarding (1) what the parties understood intellectual property to include when they were negotiating the LLC Agreement, (2) what the various deal documents included as intellectual property, and (3) what intellectual property existed and what was contributed to the Company.

### 1. The Parties' Understanding of "Intellectual Property"

Ms. Brittingham claims that she gained an understanding of what intellectual property is during her undergraduate studies and then had it further explained to her during a teleconference with Mr. Christensen that took place early in the process of drafting the LLC Agreement.

At trial, Ms. Brittingham offered varying testimony about what she believed the Defendant was going to contribute to the Company as intellectual property. She mentioned trademarks, dress designs, and collections that the Defendant had prior to the Company being formed, and she mentioned brand names and designs that would be created or developed while the Company was operating. Ultimately, while she never offered a precise definition of what she was expecting the Defendant to contribute to the Company as intellectual property, Ms. Brittingham generally testified that she thought the Defendant's name, brand, and designs were the most important assets to be contributed.

In notes that Ms. Brittingham testified are her notes that were taken about the time of her teleconference with Mr. Christensen on October 16, 2012, she stated "I will bring the cash and she will bring the intellectual property, a small inventory, & sewing equipment." There is no further explanation of what intellectual property is intended. In an e-mail sent to her then-husband on October 29, 2012, Ms. Brittingham asks him to look over notes that she intends to give to the Defendant in which she again states that the Defendant will bring intellectual property but does not explain what is included in intellectual property. Almost a year later in the negotiations, on

16

September 20, 2013, Ms. Brittingham sent an e-mail to her attorney describing the deal terms that she claimed she and the Defendant agreed to at that time:

> Nardos and I have agreed on our final terms for the partnership agreement. We will have a 50-50% profit split after our capital contributions are paid back. I will put in $200,000 and that will get paid back first. Nardos is contributing many things including fabric, sewing machines, etc. She values this at $80,000. We think this is fair and want to move forward with our partnership.

While not dispositive by any means, it is curious that Ms. Brittingham did not mention at that time that the Defendant was contributing intellectual property, including her name as a brand, when Ms. Brittingham now testifies that her brand name was crucial. Shortly thereafter, in an e-mail dated September 24, 2013, Ms. Brittingham provides a bit more insight as to what she meant when she kept referring to intellectual property. At the time, she was discussing the idea of separating the IP Assignment from the LLC Agreement with Mr. Christensen:

> I would like to keep all this language all in one document. Can't we just mention in another paragraph that we are both putting in intellectual property? Her as a designer and me as a business person and undergraduate in accounting.

With all due respect, these comments evidence a basic misunderstanding of the concept of intellectual property. Later on September 24, 2013, Ms. Brittingham sent an e-mail to the Defendant summarizing her understanding of what would be included in the IP Assignment:

> I just talked to Troy. He is finalizing the LLC and said that we could do 2 different documents. The Partnership agreement with your list of assets totaling $80,000 and then another one like you requested contributing your skills as a designer.

Thus, while Ms. Brittingham believes the Defendant's brand name is the most important part of intellectual property that should have been assigned, this was not reflected in Ms. Brittingham's descriptions of intellectual property during the actual negotiations.

There was less testimony and documentary evidence to show what the Defendant thought was meant by "intellectual property." She and her attorney testified that they discussed it, and her attorney testified that he believes the Defendant had a decent idea of what intellectual property

could include but that it seemed very broad. The Defendant essentially testified that it sounded too broad to her and that she did not intend to contribute it.

### 2. The Intellectual Property Included in the Deal Documents

While the parties may not have had the clearest understanding of what the Defendant was required to contribute, the LLC Agreement provides a great deal of specificity. Section 4.1(b) of the LLC Agreement states that the Defendant "shall contribute the property described on Exhibit A to the Company" and in addition that the Defendant "shall assign certain intellectual property to the Company pursuant to the form of assignment attached hereto as Exhibit B." Exhibit A to the LLC Agreement includes, in relevant part:

> Design concepts, plans, and sketches for designer clothing and accessory lines, marketing studies, feasibility studies, financial pro-formas, models and samples of any clothing and accessories, and any other information or development ideas that are reasonably likely to be helpful to the purpose of this Company.

The IP Assignment included:

1. All copyrights (whether registered or unregistered) ("Copyrights"), including all Copyrights related to apparel designs, design concepts, plans, and sketches for designer clothing and accessory lines, marketing studies, feasibility studies, models and samples of any clothing and accessories.

2. All trademarks, trade names, and service marks (whether any of the foregoing are registered or unregistered) ("Trademarks"), including all goodwill of the Business symbolized by the Trademarks.

3. All rights of publicity, including all name and likeness rights.

4. All registrations and applications for the foregoing.

5. All electronic or tangible materials embodying the above.

6. Any right to use or exploit any of the foregoing, including but not limited to the right to sue for, settle or release any past, present or future infringement of any of the above.

### 3. What Intellectual Property Existed and What Was Contributed

Despite the broad net that was cast for the Defendant's intellectual property, it is undisputed

that the Defendant did not have any copyrights, trademarks, patents, or service marks. It is also undisputed that the Defendant brought her sketches and designs, her production team (three seamstresses, one person to do beading, and one person to do payroll and accounting), and production materials such as fabrics, sewing machines, and mannequins with her to the Company.

The only real issue that Ms. Brittingham seems to have is that the Defendant did not assign her brand name, which is her name, to the Company. Instead, the Defendant allowed the Company to use her name during its operation, but refused to allow the Company to own her name.

In sum, the record suggests that neither Ms. Brittingham nor the Defendant actually understood the meaning of the term "intellectual property" when it was included in the draft agreements. It also suggests that neither Ms. Brittingham nor the Defendant understood what "intellectual property" the Defendant might actually own, or even what type of "intellectual property" can be developed in the fashion industry. Nevertheless, both probably knew that in the fashion industry, brand names are crucial, and for the Company they were creating, the brand name would be the Defendant's name.

## G. Credibility Determinations

Counsel for the Plaintiff urges the Court to find that one of the parties is "just lying," but the situation is more complicated than that. The events in question took place several years ago, and, as the Court noted previously, the communications between the parties throughout the process were not always as clear as they could be.

Ms. Brittingham was generally credible, but parts of her story do not appear to be accurate. It seems highly unlikely, for instance, that the Defendant suggested that the conveyance of intellectual property be accomplished in a separate document, as Ms. Brittingham claims. This suggestion clearly originated with the attorneys at Haynes and Boone. Nevertheless, Ms.

Brittingham, now obviously aware of the evidence presented at trial, did not back down from her belief that the Defendant made the suggestion, and contemporaneous e-mails indicate that Ms. Brittingham was under the same impression during the drafting and negotiation of the LLC Agreement. Thus, the Court acknowledges that this belief, while apparently inaccurate, could be genuinely held. Other aspects of Ms. Brittingham's testimony were not entirely reliable simply because her recollection was not always clear or consistent. She offered conflicting testimony, for instance, regarding whether the IP Assignment was actually printed and presented when the Defendant signed the LLC Agreement. Ms. Brittingham reconciled this testimony by stating that she was not entirely sure whether the IP Assignment was printed but that she thought it was more likely that it was. The Court wants to be clear that it did not find Ms. Brittingham's testimony dishonest, but it was not entirely reliable either.

The Defendant was also generally credible with some exceptions. She appeared to be trying to answer questions truthfully to the best of her recollection, but it was not always clear that she understood the questions. In addition, both because the Defendant had a tendency to answer questions in ways that were not directly responsive and because of a slight language barrier, her answers were somewhat difficult to pin down. The Court is inclined to believe that some of the issues that made it difficult to get clear and precise answers from the Defendant may have existed during the negotiations themselves. This could explain, for instance, why the Defendant believes she told Ms. Brittingham that the intellectual property should "come out" of the LLC Agreement and apparently during that same conversation, Ms. Brittingham left with the impression that the Defendant just wanted the intellectual property assignment to be separated from the LLC Agreement into a different document.

To the extent the Defendant testified that she repeatedly and clearly told Ms. Brittingham that she was not willing to assign her name as a brand name to the Company, that is not credible. It is not clear, however, that the Defendant and Ms. Brittingham had conversations specifically regarding the assignment of the Defendant's name. In written communications, at least, it sounds like the conversations, when they discussed actual intellectual property at all, were more concerned with intellectual property generally. It is hard to generalize about intellectual property here though. Neither party seems to have had a completely accurate understanding of what intellectual property is, and the Defendant was okay with contributing some, but not all of her intellectual property, which she did.

Mr. Christensen testified credibly in all respects.

Mr. Bonnet also testified credibly. Counsel for the Plaintiff was frustrated with Mr. Bonnet refusing to answer certain questions during his deposition based on the attorney-client privilege and then answering those same questions at trial because the attorney-client privilege was waived, but this does not appear to have rendered Mr. Bonnet's testimony inaccurate or inconsistent.

### III. Conclusions of Law

As previously stated, the Plaintiff is seeking to except its common law fraud claim from discharge, contending that the Defendant's conduct constitutes false pretenses, false representations, and actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).

**A.    The Standard for Objections to Discharge Under Section 523(a)(2)(A)**

11 U.S.C. § 523(a)(2)(A) provides:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for money, property, [or] services . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

21

In an action to determine the discharge of a specific debt, the plaintiff has the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of the debtor so that the debtor may be afforded a "fresh start." *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011); *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997). As a general matter, section 523(a)(2)(A) contemplates frauds involving moral turpitude or intentional wrong—fraud implied in law, which may exist without imputation of bad faith or immorality, is insufficient. *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992). Because section 523(a)(2)(A) only excepts debts involving moral turpitude or intentional wrongs, any misrepresentation must be knowingly and fraudulently made by the debtor. *First Nat'l Bank v. Martin (In re Martin)*, 963 F.2d 809, 813 (5th Cir. 1992).

The Fifth Circuit has distinguished the elements of "false pretenses and false representations" from "actual fraud." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995); *see also Moor v. Huffman (In re Huffman)*, No. 16-1009, 2017 Bankr. LEXIS 3569, at *21 (Bankr. E.D. Tex. Oct. 13, 2017) ("The distinction [between 'actual fraud' and 'false pretenses and false representations'] recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact."). In order for representations to be false representations or false pretenses under section 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts. *Bercier v. Bank of Louisiana (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991). A debtor's promise related to a future action that does not purport to depict current or past facts therefore cannot be defined

as a false representation or a false pretense. *Id.* Thus, to prove a debt is nondischargeable as having been obtained by false pretenses or representations, a creditor must establish (i) the existence of a knowing and fraudulent falsehood, (ii) describing past or current facts, (iii) that was relied upon by the creditor. *See RecoverEdge*, 44 F.3d at 1292-93; *Allison*, 960 F.2d at 483. Reliance on a false representation must be justifiable, but not necessarily reasonable, under the circumstances. *Field v. Mans*, 516 U.S. 59, 74-75 (1995).

"Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *RecoverEdge*, 44 F.3d at 1293. In order to prove nondischargeability under an "actual fraud" theory, the objecting creditor may prove that:

(1) the debtor made a representation;

(2) the debtor knew that the representation was false at the time it was made;

(3) the debtor made the representation with the intent and purpose to deceive the creditor;

(4) the creditor actually and justifiably relied upon the representation; and

(5) the creditor sustained a loss as the proximate result of its reliance on the representation.

*Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017); *General Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005); *RecoverEdge*, 44 F.3d at 1293.

In *Husky International Electronics, Inc. v. Ritz*, the Supreme Court held that the term "actual fraud" as used in section 523(a)(2)(A) encompasses fraudulent conveyance schemes, even if those schemes did not involve a false representation by the debtor. 136 S.Ct. 1581, 1590 (2016). On remand, the Fifth Circuit noted that *Acosta* and other precedent were effectively overruled to the extent they required a representation in order for a debt to be nondischargeable under section

523(a)(2)(A) for actual fraud. *Husky International Electronics, Inc. v. Ritz*, 832 F.3d 560, 565 n.3 (5th Cir. 2016). In this proceeding, however, the Plaintiff alleges an actual false representation by the Defendant,[6] so *Husky* and its holding as to fraudulent conveyance schemes does not affect the application of *Acosta* or *RiverEdge* to the Plaintiff's discharge objection in this proceeding.

**B.      Application of the Standard to the Facts of this Case**

The Plaintiff contributed roughly $200,000 to the Company but received a $65,000 distribution from the Company and received $1,000 from the liquidation of the Company, leaving the Plaintiff with an asserted claim of $134,000. In order for the Plaintiff to succeed in this lawsuit, it must show that the claim satisfies the elements of common law fraud and is nondischargeable under Bankruptcy Code section 523(a)(2)(A).

The Defendant made a false representation to the Plaintiff that she would assign intellectual property, including her name as a brand name, to the Company (the "Representation"). In section 4.1(b) of the LLC Agreement, which the Defendant signed, it states that the Defendant shall assign certain intellectual property to the Company pursuant to the IP Assignment. Based on the evidence presented at trial, the Court has not found any other false representations made by the Defendant regarding the assignment of her brand name or of intellectual property generally.

The Defendant's Representation was false, but the Plaintiff has not shown by a preponderance of the evidence that the Defendant knew she was making the Representation. The evidence is clear that the Defendant did not intend to perform the requirements of the IP Assignment, but the Defendant testified that she believed by taking the IP Assignment out and not signing it, she was removing it from the deal. The Defendant was not aware that she was still

---

[6] Joint Pretrial Order at 2 ("Plaintiff claims that Defendant fraudulently induced Plaintiff to contribute funds to Nardos Imam LLC (the 'Company') ***based on representations by Defendant*** that she would assign certain intellectual property to the Company, which she failed to do.") (emphasis added).

making a representation that she would convey her intellectual property in the IP Assignment in section 4.1(b) of the LLC Agreement.

The Plaintiff has not shown by a preponderance of the evidence that the Defendant made the Representation with the intent and purpose to deceive the Plaintiff, nor that the Defendant made the Representation with reckless disregard for the truth of the Representation. As already stated, the Plaintiff did not show that the Defendant knew she was making the Representation. The Defendant and her attorney testified that the Defendant wanted the broad assignment of intellectual property taken out of the LLC Agreement, and the Defendant thought that had been accomplished. It is true that Mr. Bonnet warned the Defendant that the Final Draft of the LLC Agreement still contained the assignment, but the Defendant believed she could still remove it by simply omitting the IP Assignment from the final executed version of the LLC Agreement. In this same vein, the Plaintiff has not shown by a preponderance of the evidence that the Defendant participated in a fraudulent scheme designed to trick or cheat the Plaintiff.

The Plaintiff has not shown by a preponderance of the evidence that it actually and justifiably relied on the Defendant's Representation. The Court has not found that there were any representations or promises regarding the assignment of intellectual property before the Representation made when the LLC Agreement was signed, so the Pre-Agreement Funds could not have been advanced in reliance of any kind on the Representation. Further, Ms. Brittingham and the Plaintiff were not justified in relying upon oral promises without obtaining a written commitment or promise that specifically identified the "intellectual property" to be transferred with a reasonable degree of certainty and specificity. Even if the Defendant had promised to convey her "intellectual property," which she denied at trial, the term "intellectual property" is too

vague, indefinite, imprecise, ambiguous, and unclear to constitute a representation or promise upon which Ms. Brittingham or the Plaintiff could justifiably rely—more specificity would be needed.

Ms. Brittingham and the Plaintiff were not justified in relying on the Representation by the Defendant in advancing any of the Post-Agreement Funds either. Ms. Brittingham and the Plaintiff knew, or should have known in the exercise of reasonable care and attention, that the Defendant had not signed the IP Assignment at closing, when those funds were deposited into the Company's bank account. The provision of the LLC Agreement that constitutes a promise to convey "intellectual property" states that the conveyance would be made on the November 1, 2013, "Effective Date" of the LLC Agreement. That provision is not a promise to convey the "intellectual property" in the future or upon request by the Company or the Plaintiff—it was an action to be taken contemporaneously with the execution of the LLC Agreement. The Plaintiff and Ms. Brittingham knew or should have known that the property had not been conveyed when they advanced funds to the Company.

The Plaintiff has not shown by a preponderance of the evidence that the loss experienced by the Plaintiff was a proximate result of its reliance on the Defendant's Representation. Even if the Plaintiff had shown that it relied on the Representation, the Company did not fail because the Defendant did not convey any "intellectual property" to the Company. Indeed, the Company was initially successful and continued on even after Ms. Brittingham became aware that the IP Assignment had not been signed. Instead, the Company suffered from two 50% owners in managerial deadlock.

The Plaintiff has failed to sustain its burden to prove all of the required elements under section 523(a)(2)(A) of the Bankruptcy Code to except its claim from discharge. The Plaintiff's claim for actual fraud is denied and the Defendant is entitled to judgment in her favor on account

of that claim. The Plaintiff's objection to discharge under section 523(a)(2)(A) of the Bankruptcy Code is likewise denied, and the Defendant is entitled to a judgment in her favor as to such objection.

### IV. Conclusion

This is largely a burden of proof ruling—the Plaintiff did not meet the burden of proof to establish an exception to dischargeability under section 523(a)(2)(A). The Plaintiff failed to carry its burden of showing that (1) the Defendant made a representation that she knew was false at the time it was made, (2) the Defendant made a representation with the intent and purpose to deceive the Plaintiff, (3) the Plaintiff actually, detrimentally, and justifiably relied upon any alleged false representation made by the Defendant, and (4) the Plaintiff sustained a loss as the proximate result of its reliance on the Defendant's false representation. More generally, the Plaintiff failed to show that the Defendant defrauded the Plaintiff through some sort of fraudulent scheme. For all the foregoing reasons, the objection to discharge of the Plaintiff's claim and all other relief requested by the Plaintiff are denied.

As the prevailing party in this proceeding, the Defendant claims she is entitled to recover attorneys' fees, costs, and expenses from the Plaintiff and Ms. Brittingham. Pursuant to Rule 7054(b) of the Federal Rules of Bankruptcy Procedure and Rule 54(d) of the Federal Rules of Civil Procedure, the Defendant shall file a motion seeking such attorneys' fees and costs within 21 days of the entry of the Court's Findings of Fact and Conclusions of Law. The Plaintiff shall have 21 days after the filing of the attorneys' fees motion to respond. The Court may set the matter of attorneys' fees for hearing but reserves the right to rule on the motion and the response.

### ###END OF FINDINGS AND CONCLUSIONS###